UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JEFFERY LYNN FAIR,                          )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )    Case No. 5:22-cv-679-RDP-GMB
                                            )
JEFFERY T. WESTBROOK, *et al.*,             )
                                            )
        Defendants.                         )

## REPORT AND RECOMMENDATION

Plaintiff Jeffery Lynn Fair has filed a *pro se* amended complaint seeking monetary damages and injunctive relief under 42 U.S.C. § 1983 for violations of his civil rights. Doc. 23.  He names as defendants Officer Jeffery T. Westbrook, Warden Gordy, and Nurse Perkins. Doc. 23 at 2–3.  Fair seeks monetary damages and other relief, including a return to a lower custody status, that the defendants clear a disciplinary charge from his record, and Westbrook's arrest. Doc. 23 at 12.  The complaint is before a Magistrate Judge for a preliminary report and recommendation. *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991).  For the reasons to follow, the Magistrate Judge recommends that the district court (1) grant Perkins' motion for summary judgment and (2) grant in part and deny in part the motion for summary judgment filed by Westbrook and Gordy.

## I.  PROCEDURAL HISTORY

After Fair initiated this action, he filed a second complaint alleging claims arising from the same incident, so the court consolidated the two cases. *See* Doc. 7. Fair then filed two motions to introduce additional evidence. Docs. 9 & 11.  The court ordered Fair to submit one final amended complaint, and he complied. *See* Docs. 18 & 23.  This final amended complaint (Doc. 23) is the operative complaint.

The court entered an Order for Special Report directing the Clerk of Court to forward copies of the amended complaint to each of the named defendants and directing them to file special reports addressing the plaintiff's factual allegations. Doc. 26.  Perkins filed a special report (Doc. 33), while Westbrook and Gordy jointly filed a special report with supporting evidence. Doc. 37.  The court construed the special reports to be motions for summary judgment and notified Fair that he had 21 days to respond to the motions for summary judgment by filing affidavits or other evidence. Doc. 39.  Fair filed a consolidated response. Doc. 40.

In response to some of Fair's statements in his response (*see* Doc. 40 at 5–6) as well as statements from Law Enforcement Services Division ("LESD") Review Officer Brian Adams (*see* Doc. 37-6 at 3), the court ordered the defendants to submit declarations from Adams and LESD Director Arnaldo Mercado about the existence of audio or video recordings of the incident. Doc. 41.  Counsel has submitted the

declarations of Officer Adams, Director Mercado, and David Courson, the Director of Security Technology for the Alabama Department of Corrections ("ADOC"). Doc. 46. This matter is now before the court on the defendants' motions for summary judgment.

## II. STANDARD OF REVIEW

Because the court has construed the defendants' special report as motions for summary judgment, Federal Rule of Civil Procedure 56 governs the motion. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences against the moving party. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The moving party has the initial burden of showing there are no genuine issues of material fact and he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Fair has the ultimate burden of proving his claims, so the defendants will be entitled to judgment as a matter of law on any claim unless Fair is able to show some evidence supporting each element of that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. In such a situation, there can be no genuine

3

issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532 (citations and internal quotations omitted).

In determining whether to grant summary judgment, however, the court will consider any "specific facts" pled in a *pro se* plaintiff's sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).  Additionally, because Fair is *pro se*, the court must construe the amended complaint more liberally than a pleading drafted by a lawyer. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).

### III.  SUMMARY JUDGMENT FACTS[1]

#### A.    The Incident

The primary events in this case occurred during Fair's incarceration at Bibb Correctional Facility in Brent, Alabama.  At approximately 1:05 p.m. on February 25, 2022, Fair went to the shift office to complain that other inmates had taken his property and threatened him. Doc. 23 at 11.  While Fair waited to speak with a correctional officer, Westbrook unlocked the gate and let in an inmate who

---

[1] The defendants' version of these events differs from Fair's recollection in material respects. Where appropriate, the court references the defendants' statements in its recitation of facts but, as the standard requires, credits Fair's version at this stage in the litigation.

previously threatened Fair. Doc. 23 at 11–12.  Fair told Westbrook that the inmate had threatened him, but Westbrook told Fair to go back to his cell. Doc. 23 at 12; Doc. 37-7, Fair Interview at 02:10.  Fair refused to comply with Westbrook's order, told Westbrook "I ain't going no damn where," and "wrapped [him]self around a pole in the corridor." Doc. 23 at 12; Doc. 37-3 at 1; Doc. 37-7, Fair Interview at 02:15.

Fair alleges that Westbrook then put a handcuff on one of his hands and choked him until he was unconscious and had urinated on himself.[2] Doc. 23 at 5; Doc. 37-7, Fair Interview at 02:22, 09:10.  Westbrook recalls that when he touched Fair, Fair used his right elbow to strike Westbrook in the nose. Doc. 37-1 at 2; Doc. 37-7, Westbrook interview at 02:50; *see also* Doc. 37-6 at 22; Doc. 37-3.  Westbrook contends that he then performed a "two-on-one takedown" and placed Fair in handcuffs. Doc. 37-1 at 2.  Fair remembers that Westbrook hit a button and other correctional officers arrived, but they "failed to stop the excessive force being applied." Doc. 23 at 4; Doc. 37-7, Fair Interview at 09:30.  Westbrook denies that he choked or hit Fair in the face or head, and he maintains that Fair never lost consciousness. Doc. 37-1 at 2.

Fair claims that a camera in the corridor by the kitchen entrance recorded the incident. Doc. 23 at 12.  The defendants have not produced any video recordings of

---

[2] Fair claims that he lost consciousness for four to five hours. Doc. 23 at 5.

the incident.  Director Courson declares that he "cannot tell from the incident report in this case whether [the more than 160 cameras at Bibb] cover the area where the incident involving Inmate Fair occurred" (Doc. 46-3 at 1) and that has no personal knowledge of any video recording of the incident. Doc. 46-3 at 2.  However, he mentions that any video recording of the incident would have been accessible for 30 days by any wardens or captains at Bibb, plus LESD or the Office of Investigator General ("OIG"). Doc. 46-3 at 2.  After 30 days, ADOC's video retention policy allows the facilities to overwrite any recordings. Doc. 46-3 at 2.

Fair refused to make a written statement about the use of force on February 25, 2022. Doc. 37-6 at 20.

## B.    The Health Care Unit

After the incident, Westbrook walked to the shift office where Sergeant Jones called for a wheelchair to take Fair to the health care unit. Doc. 37-1 at 2; Doc. 37-7, Westbrook interview at 04:37.  Jones assisted in escorting Fair to the health care unit and remembers that Fair was conscious but was "in and out" and seemed "dazed." Doc. 37-7, Jones interview at 00:50–01:15.  Westbrook also went to the health care unit around 1:15 p.m., where Nurse Montgomery evaluated him and completed a body chart. Doc. 37-6 at 19.  Her notes reflect that Westbrook had pain in his right ring finger and soreness to his nose, but no open wounds or cuts. Doc. 37-6 at 19.

Approximately 15 minutes after the incident, Nurse Lawrence completed a body chart on Fair. Doc. 37-4 at 1.  According to the body chart form, Fair stated that he "fell down, hit face." Doc. 37-4 at 1.  Fair had a bump on the back left side his head, a small knot on the front left side of his forehead, and an open area that was swollen near his left cheekbone. Doc. 37-4 at 1.  Nurse Lawrence made the following notation: "brought in via [wheelchair]; fell in corridor.  A & O x 4 [(alert and oriented to person, place, time, and event)]; became argumentative; refused care and signed refusal form.  Agitated.  Released to ADOC care." Doc. 37-4 at 1.

Nurse Montgomery placed Fair in the Restrictive Housing Unit at 1:20 p.m. with 15-minute security checks. Doc. 37-4 at 3, 5.  Five minutes later, Nurse Lawrence attempted to assess Fair, but he refused treatment. Doc. 37-4 at 4.

For an unexplained reason, Captain Carter escorted Fair back to the health care unit in handcuffs at 1:35 p.m. Doc. 37-4 at 2.  The intake nurse documented the following statement from Fair: "I came up here to explain that I don't need to be in there," meaning the Restrictive Housing Unit. Doc. 37-4 at 2.  The intake nurse completed another body chart and indicated that Fair had a bump/knot on the back left side of his head, a small knot on the left side of his forehead, three dime-sized abrasions on his right elbow, and an abrasion on his right wrist. Doc. 37-4 at 2.  The intake nurse also noted an "open area to L[eft] face.  [Inmate] appears intoxicated & hostile.  When asked to sit down [inmate] became hostile with [ADOC] officer."

7

Doc. 37-4 at 2.

Officer Cutts was assigned to the infirmary when Carter brought Fair to the health care unit. Doc. 37-7, Cutts interview at 00:54–01:00. Cutts tried to put a mask on Fair because he was handcuffed, but he "jump[ed] up in a very fast manner as if he was going to head butt" Cutts. Doc. 37-6 at 21; *see also* Doc. 37-7, Cutts interview at 01:05–1:15. Officer Cutts stepped out of the way, pushed Fair back, and Fair fell to the ground. Doc. 37-6 at 21; Doc. 37-7, Cutts interview at 01:15–01:45. Fair does not remember this incident with Officer Cutts in the infirmary. Doc. 37-7, Fair Interview at 03:55.

Fair contends that when he "came back to [himself, he] had bandages from ear to ear across [his] cheekbones, forehead, and top of [his] head in back," and remembered urinating on himself. Doc. 23 at 5; Doc. 37-7, Fair Interview at 02:30. Fair asserts that his "nose and ears poured blood for approximately 5 months" but "medical disregarded his plea for help waiting to be x-rayed and MRI." Doc. 23 at 5; Doc. 37-7, Fair Interview at 03:10, 03:17. He also claims that it took six weeks to receive x-rays, that some of his medications were not received or delayed, and that "dental" told him that they could not do anything about his dentures (which were broken during the incident) until December 2022. He alleges has lost 20 pounds because he could not chew and digest his food properly. Doc. 23 at 13–14.

Fair specifically alleges that the "head of nursing [at Bibb] failed to act . . . by

not answering 6 medical sick calls [and] 3 grievance forms." Doc. 23 at 4.  He also claims that he had two emergency room visits. Doc. 37-7, Fair Interview at 03:04. The record contains only one sick call request on April 11, 2022, when Fair complained of dizziness, pain, and a nosebleed. Doc. 37-4 at 6.  There are no emergency room visits documented in the record.  Nurse Perkins was the Health Services Administrator for Bibb, but she never provided any nursing care to Fair and was not aware of his medical problems. Doc. 33 at 24–26.

**C.     Disciplinary Proceeding and Review**

On February 26, 2022, the day after the incident, Officer Wilson served Fair with a disciplinary report and informed him of his rights to ask questions and to present oral or written statements at the disciplinary hearing. Doc. 37-5 at 1.  Fair refused to sign the report. Doc. 37-5 at 1.  After a hearing on March 7, 2022, Hearing Officer John Hutton found Fair guilty of assault on an ADOC official. Doc. 37-5 at 2–4.  Westbrook testified at the hearing; Fair refused to give a statement and asked to be excused from the hearing. Doc. 37-5 at 2.

Warden Gordy approved the disciplinary decision on March 9, 2022. Doc. 37-5 at 5–7.  Fair claims that Warden Gordy "signed off on [his] disciplinary without viewing the tape." Doc. 23 at 7.  Gordy testified that "[t]here was no video

surveillance in the area where the incident occurred," so there was nothing to view.[3]

Doc. 37-2 at 1. Director Courson declared that there are more than 160 cameras at

Bibb that are continuously recording. Doc. 46-3 at 1–2. However, as explained

above, Courson could not determine whether any of the cameras covered the area

where Fair's incident occurred. Doc. 46-3 at 1. Fair also claims that Gordy sent

Captain Smith to Fair's cell to tell Fair to say that "[he] was on drugs and [Gordy]

would make the whole thing disappear." Doc. 23 at 7; Doc. 37-7, Fair Interview at

05:30–06:15.[4] Gordy denies that he sent Smith to Fair's cell. Doc. 37-2 at 1.

On May 3, 2022, LESD Review Officer Monique Patterson completed a Use

of Force Audit Report. Doc. 37-6 at 1. Although Patterson checked a box on the

report indicating that Westbrook was justified in his use of force against Fair (Doc.

37-6 at 1), LESD Review Officer Adams conducted an independent review on May

13, 2022, noting that Patterson's findings were inconclusive. Doc. 37-6 at 3–4.

During his review, Adams obtained "Audio/Video Media Recordings," which

consisted of his interviews with Fair, Westbrook, Cutts, and Jones. Doc. 37-6; Doc.

37-7; Doc. 46-1. Adams concluded that both Westbrook and Cutts were justified in

---

[3] In his response to the special reports, Fair claims he told Gordy that if the video "did not show the truth then [he] could make arrangements with [his] sister for [Gordy] to view (2) videos of the incident that was caught by two different inmate[s] on their cell phones. They had got word to [him] in lock-up that they had the whole incident taped on their phones and would take a hundred dollars - $100.00 for the video. I gave them my sister's phone [number]." Doc. 40 at 6.
[4] In an unsigned Investigative Report by Captain Smith, he stated that he spoke with Fair about the incident on April 13, 2022, and Fair said he did not know what happened. Doc. 37-6 at 2.

using force against Fair.[5] Doc. 37-6 at 5–6.[6]

## IV. ANALYSIS

Fair claims that Westbrook used excessive force against him and that Nurse Perkins was deliberately indifferent to his medical needs, both in violation of the Eighth Amendment. Doc. 23 at 2, 3. He also contends that Warden Gordy violated his due process rights under the Fourteenth Amendment. Doc. 23 at 2. He sues the defendants in their official and individual capacities.[7] Doc. 23 at 2–3. He also seeks Westbrook's arrest. Doc. 23 at 12.

Before addressing these claims, the court notes that Fair contends that correctional officers with "unknown names" failed to intervene in Westbrook's use of excessive force. Doc. 23 at 3. He also claims that unnamed medical professionals at Limestone Correctional Facility later were deliberately indifferent to his medical needs. Doc. 23 at 5, 7, 13–14. However, as noted in the order for special report (Doc. 26 at 4), federal courts generally do not permit fictitious-party pleading unless a plaintiff can specifically describe or identify the defendant. *See Richardson v.*

---

[5] During his investigation, Adams also asked Captain Carter "if all emergency medical runs are documented in incident reports," and Carter replied, "Yes." Doc. 37-6 at 5.

[6] Fair claims that at some point he had a custody review hearing and "Captain Carter stated that [Fair] hit [] Westbrook in the face and knocked out one of his teeth. In [Westbrook's] affidavit he clearly states [Fair] elbowed him in his nose." Doc. 40 at 4. Fair's custody review hearing and Captain Carter's statements are not a part of the record.

[7] Although Fair did not check the box for individual capacity under Warden Gordy on his amended complaint (Doc. 23 at 2), the court liberally construes Fair's amended complaint to include both individual and official capacity claims against Gordy.

*Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); *New v. Sports & Rec., Inc*., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997).  Because Fair has not identified the officers or the medical professionals at Limestone, these are not proper defendants, and the court does not consider the claims stated against them.

## A.    Injunctive Relief

As one form of relief, Fair asks the court to order the arrest of Westbrook. Doc. 23 at 12.   But "there is no federal right to have criminal wrongdoers prosecuted." *Marsh v. Kirschner*, 31 F. Supp. 2d 79, 81 (D. Conn. 1998) (citing *Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (per curiam) (holding that inmates claiming that they were beaten by guards during prison uprising lacked standing to challenge state officials' opposition to issuance of arrest warrants against guards); *Linda R.S. v. Richard D.,* 410 U.S. 614, (1973) (holding that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another")). For this reason, Fair cannot seek an arrest warrant against Westbrook through a § 1983 claim.

## B.    Official Capacity Claims

To the extent Fair brings his claims against the defendants in their official capacities, these claims cannot survive summary judgment because the Eleventh Amendment bars § 1983 claims against the state or an agency of the state. *See Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Eleventh

Amendment immunity "has also been extended to state officials, acting in their official capacity, where an agency or individual may 'be treated as an arm of the State partaking of the Eleventh Amendment Immunity.'" *Melton v. Abston*, 841 F.3d 1207, 1233 (11th Cir. 2016), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity." *Id.* Congress has not waived, and Alabama has not abrogated, the state's Eleventh Amendment immunity. *Id.* at 1234. "Consequently, Alabama state officials are immune from claims brought against them in their official capacities." *Id.* For this reason, the defendants are immune from suit in their official capacities for claims seeking monetary damages.

## C.    Individual Capacity

The Eleventh Amendment does not immunize state officials from § 1983 claims against them in their individual capacities. *Melton*, 841 F.3d at 1234. The court first addresses Fair's claim that Westbrook used excessive force against him, then moves to his contention that Nurse Perkins was deliberately indifferent to his medical needs, and finally discusses whether Warden Gordy violated his due process rights. For the following reasons, the court concludes that summary judgment is due to be denied on Fair's excessive force claim and granted as to the other two claims.

13

### 1.    *Excessive Force—Officer Westbrook*

The Eighth Amendment's proscription of cruel and unusual punishments protects prisoners from prison officials' use of excessive force. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).  The federal courts analyze excessive force claims under the standards set forth in *Hudson v. McMillian*, 503 U.S. 1 (1992) and *Whitley v. Albers*, 475 U.S. 312 (1986).  This analysis includes both a subjective and an objective component: (1) whether "the 'officials act[ed] with a sufficiently culpable state of mind'" and (2) whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)).

For the subjective component of the analysis, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7.  Relevant factors include: (1) the need for any application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible official, (4) any efforts to temper the severity of a forceful response, and (5) the extent of the inmate's injury. *Id*. at 6; *see also Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).

The objective component of an excessive force claim "focuses on whether the official's actions were harmful enough . . . or sufficiently serious to violate the

14

Constitution." *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (internal quotation marks and citations omitted). The Supreme Court has "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). Instead, "the Eighth Amendment prohibits force that offends 'contemporary standards of decency,' regardless of whether 'significant injury is evident,' though the extent of injury may shed light on the amount of force applied or 'whether the use of force could plausibly have been thought necessary.'" *Sconiers*, 946 F.3d at 1265 (quoting *Wilkins*, 559 U.S. at 37). Although the Eleventh Circuit has rejected a bright-line standard mandating a more-than-*de-minimis* injury, the Eighth Amendment still "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Sconiers*, 946 F.3d at 1265–67 (citing *Wilkins*, 559 U.S. at 37–38).

"Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 5, 20 (1979). Generally, courts "do not second-guess prison officials on matters that they are better equipped to handle under the exigencies of an internal disturbance." *Wilson v. Blankenship*, 163 F.3d 1284, 1295 (11th Cir. 1998). "When evaluating whether the force used was excessive, we give broad

15

deference to prison officials acting to preserve discipline and security." *Pearson v. Taylor*, 665 F. App'x. 858, 863–64 (11th Cir. 2016). "In general, prison officers are authorized to use force when a prisoner repeatedly fails to obey an order. Officers are not required to convince every prisoner that their orders are reasonable and well-thought out before resorting to force." *Id.* (internal citations omitted). With these legal principles in mind, the court turns to Fair's claim that Westbrook used excessive force on him.

Based on the evidence before the court, the incident began when Fair refused Westbrook's order to return to his cell. Doc. 23 at 12; Doc. 37-3 at 1; Doc. 37-7, Fair Interview at 02:10. Not only did Fair refuse to comply, he "wrapped [him]self around a pole in the corridor." Doc. 23 at 12; Doc. 37-7, Fair Interview at 02:15. Fair's recalcitrance, refusal to return to his cell, and wrapping himself around a pole established the need for some force. The amount of force Westbrook used, however, is in dispute. And that dispute creates a jury question as to whether the force was excessive.

Fair alleges that Westbrook put a handcuff on one of his hands and then choked him until he was unconscious and had urinated on himself. Doc. 23 at 5; Doc. 37-7, Fair Interview at 02:22, 09:10. Westbrook remembers that Fair struck him in the nose, and he denies choking or hitting Fair in the head. Doc. 37-1 at 2; Doc. 37-7, Westbrook interview at 02:50. At the summary judgment stage, however,

16

the court must take Fair's sworn allegations as true.  And under Fair's version of the facts, he did not actively resist Westbrook before Westbrook choked him until he lost consciousness.  A reasonable juror could conclude that Westbrook acted "maliciously and sadistically" to cause harm if he choked Fair under these circumstances. *See, e.g.*, *Williams v. Bramer*, 180 F.3d 699, 703–04 (5th Cir. 1999) (finding that choking a detainee for complaining was sufficient to state a claim of excessive use of force based on the "nature of the force rather than the extent of the injury").

Although Westbrook highlights certain discrepancies in the record—for example, evidence tending to show that Fair was conscious, argumentative, hostile, and appeared to be intoxicated (Doc. 37-4 at 1–2, 4; Doc. 37-6 at 20)—"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Fair will have to explain those inconsistencies to the jury.  At this stage, Fair's account provides evidence from which a reasonable juror could find that Westbrook applied force maliciously and sadistically to cause harm.  Accordingly, summary judgment is due to be denied on Fair's Eighth Amendment excessive force claim against Westbrook.

### 2.    *Deliberate Indifference to Medical Needs—Nurse Perkins*

The "deliberate indifference to serious medical needs of prisoners constitutes

17

the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 182–83, (1976)).  However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105.  For example, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106.  Instead, "to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.*

Accordingly, "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).  "Summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.'"

18

*Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996)) (italics and citations omitted). "Likewise, in addition to the subjective awareness of the relevant risk, . . . plaintiff [must] show more than mere negligence to establish a violation of the Eighth Amendment and defeat a prison official's motion for summary judgment." *McElligott*, 182 F.3d at 1255.

Fair's deliberate indifference claim against Nurse Perkins stems from his allegation that the "head of nursing failed to act . . . by not answering 6 medical sick calls [and] 3 grievance forms" Doc. 23 at 4. He also claims that his "nose and ears poured blood for approximately 5 months" but "medical disregarded his plea for help waiting to be x-rayed and MRI." Doc. 23 at 5.

The undisputed evidence does not support Fair's allegations. Instead, the evidence shows that Nurse Perkins was the Health Services Administrator for Bibb Correctional Facility, but she never provided any nursing care to Fair and she was not aware of his medical problems. Doc. 33 at 24–26. More specifically, the record reflects that Nurse Lawrence and another intake nurse (not Perkins) saw Fair on the day of the incident and completed his body charts. Doc. 37-4 at 1–2. There is no evidence that they ignored medical requests. Instead, the record reflects only one sick call request by Fair on April 11, 2022, in which he complained of dizziness, pain, and a nosebleed. Doc. 37-4 at 6. A health professional named B. Chittle signed

19

the request. Doc. 37-4 at 6.

Fair does not dispute any of this evidence. He therefore has not established that Nurse Perkins had subjective knowledge of a risk of serious harm to him. For this reason, Perkins' motion for summary judgment on Fair's claim against her for deliberate indifference to medical needs is due to be granted.

### 3.    *Fourteenth Amendment Due Process—Warden Gordy*

The Due Process Clause of the Fourteenth Amendment states "that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]'" *King v. Pridmore*, 961 F.3d 1135, 1143 (11th Cir. 2020) (alterations and omission in original) (quoting U.S. Const. amend. XIV, § 1). The Due Process Clause provides two types of constitutional protection: procedural due process and substantive due process. *Id.* (citation omitted). Fair alleges a claim for procedural due process against Warden Gordy. *See* Doc. 23 at 7.

Section 1983 claims for deprivation of procedural due process have three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). A procedural due process violation is not complete "unless and until the State fails to provide due process." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (quoting *Zinermon v. Burch*, 494 U.S. 113, 123 (1990)).

Fair claims that Warden Gordy approved of his disciplinary conviction without viewing the video recording. Doc. 23 at 7. Fair separately contends that Gordy sent Captain Smith to his cell to tell him Gordy would "make the whole thing disappear" if he said he was on drugs at the time. Doc. 23 at 7; Doc. 37-7, Fair Interview at 05:30–06:15. None of these allegations amount to a procedural due process violation.

Gordy testified that there was no video surveillance in the area where the incident occurred. Doc. 37-2 at 1. But even if there had been a video recording of the incident that Gordy did not view, prison inmates have no constitutionally guaranteed immunity from a false or wrongful accusation of conduct even if the accusation could result in the deprivation of a protected liberty interest.[8] *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). So long as Fair had the benefit of the minimum procedural due process protections set forth in *Wolff v. McDonald*, 418 U.S. 539 (1974), he cannot recover damages.

Under *Wolff*, an inmate must receive: (1) advance written notice of the charges against him, (2) an opportunity for the inmate to call witnesses and present documentary evidence if doing so is consistent with institutional safety and correctional goals, and (3) a written statement by the factfinder outlining the

---

[8] Furthermore, as noted above, Fair does not dispute that he refused to comply with Westbrook's orders to return to his cell and wrapped himself around a pole. Doc. 23 at 12; Doc. 37-3 at 1; Doc. 37-7, Fair Interview at 02:10, 02:15.

21

supporting evidence and the reasons for the disciplinary action. *O'Bryant v. Finch*, 637 F.3d 1207, 1213 (11th Cir. 2011) (citing *Wolff*, 418 U.S. at 563–67). Procedural due process is satisfied if there is "some evidence" in the record to support the finding of guilt. *Id.* (citing *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445, 454 (1985)).

Here, Fair was given advance written notice of the charge against him and an opportunity to call witnesses and to testify. Doc. 37-5 at 1–3. In response, Fair refused to sign the notice, did not call any witnesses, refused to give a statement, and asked to be excused from the hearing. Doc. 37-5 at 1–3. Fair received a written decision setting out the hearing officer's findings, and the report demonstrates that the hearing officer received evidence, including testimony from Westbrook, supporting the finding that Fair assaulted an ADOC officer. Doc. 37-5 at 2. Warden Gordy then gave his approval of the decision. Doc. 37-5 at 5–7. While Fair may not agree with the resolution of his disciplinary hearing, he was afforded sufficient due process protections. Accordingly, Gordy's motion for summary judgment should be granted as to Fair's Fourteenth Amendment due process claim.[9]

## V.  RECOMMENDATION

For these reasons, the Magistrate Judge RECOMMENDS as follows:

---

[9] Because this claim fails, Fair is not entitled to have the disciplinary charge cleared from his record or to receive a reclassification to a lower custody level. Doc. 23 at 12.

1.      The motion for summary judgment (Doc. 33) filed by Perkins be GRANTED and this action be DISMISSED with prejudice as to Fair's claims against Perkins.

2.      The motion for summary judgment (Doc. 37) filed by Westbrook and Gordy be GRANTED in part and DENIED in part.  The court RECOMMENDS that the claims against Gordy by DISMISSED with prejudice, but that the claim for excessive force against Westbook remain pending.

3.      The Magistrate Judge further RECOMMENDS that the court refer the remaining claim against Westbrook back to him for further proceedings.

## VI.  NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within **14 days.**  The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order.  Without a proper objection,

however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify in whole or in part the Magistrate Judge's findings of fact and recommendations.  The District Judge will conduct a hearing if required by law and may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Otherwise, the District Judge may consider the record developed before the Magistrate Judge in making an independent determination of the relevant legal issues.  The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may appeal only from a final judgment entered by a District Judge.

DONE and ORDERED on January 29, 2024.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE